The fourth case of the day, which is 21-11892, Victor Elias Photography v. Ice Portal. And I see that we have Mr. Rothman here for the appellant, Mr. Wolfson here for the appellee. Mr. Rothman, whenever you're ready, no hurry. Good morning, Your Honors, and may it please the Court. Joel Rothman for Victor Elias Photography, a resort and hotel photographer, v. Ice Portal, a company whose business is distributing photographs like my client's throughout the Internet. It's a case of first impression with respect to the interpretation and application of Section 1202 of the Copyright Act. Before this Court, the question of 1202's interpretation and application was previously addressed by the Second Circuit, the Third Circuit, and by the Ninth Circuit in cases that are all in the briefs. Murphy in the Third Circuit and Mango in the Second Circuit. But this Court hasn't had the opportunity yet to review and decide what the elements of the claims are, what knowledge is required, because knowledge appears several times in the statute. The District Court below granted summary judgment to the defendants. It did so despite the fact that the defendants had knowledge that its actions in removing copyright management information, CMI metadata, from my client's photos. It acquired that knowledge in 2014 in connection with prior litigation involving its competitor, Leonardo. It acquired more knowledge in 2016 in a second arbitration. It was subject to several depositions and allegations of exactly the same conduct that's alleged here. There were a total of three depositions taken of executives of the defendants, two of Mr. McMahon and a third of Mr. Woodman. All of those are in the record. They demonstrate that the defendant had knowledge and knew that its system, that it programmed, was removing copyright management information. So just so I'm clear, that's what this case is about. It's about Shigi or ICE Portal itself intentionally removing the CMI, not about its knowledge that hotels had removed the CMI. Right. The allegations here and the evidence below demonstrated that it was ICE Portal's system that removed the copyright management information. It was – there is nothing in the record that indicates that the hotels were removing that. That was potentially an issue in the Stevens case, v. CoreLogic. It didn't make very much noise in the Ninth Circuit's decision, but it was part of the argument. It was part of the district court where the issue was brought up. Well, maybe the metadata might have been removed before it was uploaded to CoreLogic's system, but that wasn't the case here. In fact, there was evidence, and we show the excerpt of a spreadsheet in the briefs, indicating that the information that Mr. Elias put in his photos was in fact stripped out by the ICE Portal system. So the issue that the district court addressed was knowledge in the two scienters, but the reality is that, of course, knowledge, which comes up more often in criminal prosecutions – The 1202B statute we're dealing with has the potential for being a criminal statute and has a civil remedy component as well. Isn't this a pretty broad infringement reading that you're asking that we propose here? No, I don't think it is, Your Honor. I don't think that – and first of all, let's make sure we're using our terms correctly. Infringement, which is a term in Section 501 of the Act, relates to a violation of any of the 106 rights of the author. And infringement is not mentioned in 1202, the term. 1202 deals with the removal of copyright management information. It was something that was part of Congress's implementation of the WIPO Copyright Treaty. It's necessary in order for the U.S. to continue adherence to the Berne Convention. It is an important right in light of the fact that the internet is the world's largest copy machine. Can I ask you just a quick question? I just want to make sure – you said something a minute ago, and I just want to make sure that I'm tracking. You said 1202 doesn't mention infringement. I thought the last sentence of 1202B said that the plaintiff has got to show that there are reasonable grounds to know that the defendant would have induced, enabled, facilitated, or concealed an infringement of a copyright. In the sense that the infringement of copyright that we're dealing – and I did misspeak, okay? The issue with 1202 is a violation of another right that the copyright owner has under the statute. So the right to protect their own work from being copied, reproduced, distributed, et cetera, would be a right that it protected. But 1202 itself does not address infringement. 1202 deals with removal of copyright management information, distribution of works that had copyright management information removed from them. And so the text of the statute is squarely focused on this act of removing the information that's in metadata, that's in, for example, a watermark that identifies the photographer. Very important for photographers. If you pick up any newspaper – not too many people read newspapers anymore. I do. Gutter credit is below each photograph. Photographers have for a century asked for and received credit for their work. Photographers need that credit in order so that they can continue their living because they typically are not paid what they would otherwise receive. And so they have the right, if they retain their rights to their image, to license those images to others. So you have to be able to identify the photographer. In addition, it's a matter of photographers showing their proprietary rights in their images. The photographers would like to know that the world credits them and sees them as the source. With respect to facilitating infringement, is the idea that it would be infringer if he or she sees the metadata, will think twice, like maybe I shouldn't copy this thing. If he sees the metadata, sees any attribution, that was the case in Mango. In Mango, after a bench trial, the district court determined that the individual who wrote the article and posted the photo, who removed the attribution, knew that the attribution was there to identify the photographer and wanted to remove it or change it in order to prevent others from finding out that there was infringement occurring. The difference between Mango in this case is that the plaintiff is not alleging that Ice Portal infringed, but the extensive evidence showed that Ice Portal knew for years that its removal occurred and had been the source of complaints from its biggest competitor who also owned images, that those images were being distributed with metadata stripped out. Knowing that and understanding how important it is to photographers and the law that that information be retained, Ice Portal was on years of notice. Clearly, if there's a knowledge element in a statute and it is debated as it was here, this should have gone to the jury. The case law is legion on that. The other thing I'd like to note before my time runs is the Ninth Circuit's decision, which we mentioned in the brief, relied on a case. I don't know where it came from, Your Honor. I was just looking at the briefs before the Ninth Circuit. Neither side mentioned the case, the United States, the criminal case they ultimately relied on concerning modus operandi. It's really not relevant to the decision that this court needs to make, and I'll reserve the remainder of my time for rebuttal. Okay, very well. Thank you. All right, Mr. Wolfson, you're up for 15 minutes. Thank you, Your Honor. May it please the court, David Wolfson for Appellee Shigi. So the main issue before the court, we had alternative reasons why the district court could be affirmed on alternative grounds that the district court did not reach in granting the motion for summary judgment. But the main issue on appeal is, was there any evidence sufficient to create a jury issue before the district court in the summary judgment record with regard to what the Mango case and the CoreLogic case and my friend on the other side called the second scienter element. So that second scienter element requires a plaintiff to come forward with admissible evidence that the defendant has reasonable grounds to know an objective standard that it's knowing removal of CMI will induce, enable, facilitate, or conceal copyright infringement. And the district court in its well-reasoned opinion said, okay, under the Celotex case, the summary judgment standard from the 1986 Supreme Court case, we, Shigi, have filed a brief that canvassed the summary judgment record and said, where is that evidence? There is no such evidence. And so it was incumbent upon Elias to show the district court where in the record there was any such evidence. Now, today we heard from Mr. Rothman that the evidence was in the form of the prior arbitration proceedings. And that the mere fact that this competitor of Shigi called Leonardo in an arbitration, AAA arbitration, had made complaints about Shigi's system was sufficient for the rest of time to imbue, that's their word from the brief, imbue my client Shigi with the state of mind that would violate the second scienter prong. Now, when your honors review or have reviewed the actual AAA arbitration award, it determined on AAA rule 33, okay? Rule 33 is a dispositive motion. So that three judge panel, which included Judge Holderman, formerly chief judge of the Northern District of Illinois, said, in well-reasoned opinion, says, we've looked at the evidence that you've mustered, Leonardo, and there's nothing there. They said that, first of all, and this is at pages 8 and 10 of the opinion, which is a docket entry 40-53, the combination of emails and admissions show that Leonardo consented to have TravelClick, which was one of those intermediaries representing the hotels, remove Leonardo's CMI. Leonardo was okay with the CMI being removed. So that was one takeaway from the arbitrations panel's decision. They also said, and this is even more important, Leonardo hasn't shown an essential ingredient of a DMCA claim, that any allegedly improper actions about CMI would result in an infringement of a copyright. And then finally, the panel finds, and this is at page 16 of the opinion, Leonardo doesn't complain that ICE Portal removed the hotel's CMI. So there's no connection for the image owner slash copyright management information and printer that resulted in an infringement. So what's the takeaway my client gets from the sole quote-unquote evidence that was in front of the district court, this arbitration? It's saying, your process is okay. And let me back up and say that my client doesn't distribute the photographs. Shigi is a critical part of the process whereby photographers like Mr. Elias, Victor Elias, who owns the corporate entity Elias, get to get paid to take photographs of hotels, hotel rooms, the pool, the food, the different types of rooms, and process those so that they can efficiently and cost effectively be distributed as Mr. Elias intended so that they are made available to the online travel agencies. If my client had not been there, Mr. Elias never would have got hired to take those photographs. Photographs were used precisely as intended. He got paid, and there's no dispute that there was no infringement by my client or anybody else in the chain here, and he got paid to take those photos. And then they were distributed to the online travel agencies so that any of us could go online and look for a hotel, say, in Puerto Vallarta, although I don't know if in Miami right now you probably wouldn't look for a hotel there. And so they were used precisely as intended with no infringement. So the takeaway from the arbitration was your process is okay. There's nothing about it that is promoting infringement. There's nothing about it that's concealing infringement. Yes, Your Honor. I guess I had assumed that the argument that the other side was making from the arbitration was aimed more at meeting what I'll call the first scienter requirement, that somehow you knew that your system was stripping the CMI out. And maybe that they don't think the arbitration proves the second scienter point, but that it proves the first one. Like we've gotten now knowing removal on your part. Now the question with respect to the second scienter requirement is, you know, can you be charged with constructive knowledge that that fact, your removal, would induce, facilitate infringement? And I guess I view those two things as separate. It sounds like you are sort of at least attributing to them an argument that somehow the arbitration evidence has to prove the second scienter element. And I guess I just hadn't thought about it that way. I had thought that they said arbitration evidence proves the first scienter element. Now we're on to the second scienter element. And basically I think their argument is, isn't it a reasonable inference that if you strip out the CMI, would-be infringers are more likely to infringe? What about that? I think that's true. Maybe that's not even the argument they're making. I think that's two questions. So I'm going to answer both of the questions, of course. So question number one, I think no, the answer is no. I think they are saying, and it's at pages 48 and 43 of their principal brief. At page 48 they say, Leonardo's claims put ICE Portal on notice and imbued ICE Portal with the necessary mental state to violate section 1202 in the future. And I think the context is that they're saying it satisfies scienter prong number two. And at page 43 they say the district court was, and remember the district court granted us summary judgment based solely on scienter prong number two. The reasonable grounds to believe that it would facilitate, et cetera. Right, Your Honor? So they fault the district court for doing that in part based on the Leonardo arbitration. Presumably this is page 43 of their principal brief. The district court's ruling that the plaintiff presented no evidence of reasonable grounds can't be squared, and this is prong two, with the extensive record evidence that ICE knew from its arbitrations with Leonardo that it routinely stripped the CMI from copyright owners, and that these violations aggrieved copyright owners. So that's page 43 of their brief. So I think they're saying Leonardo covers both prongs. As to the second, I agree with Your Honor. That is a separate animal, okay? And you can't conflate these two prongs. Congress clearly was requiring more than merely the fact, was requiring plaintiffs in DMCA cases to prove more than merely the fact that one knows that the metadata is being removed. Because in fact, ironically, in the Mary Beth Peters, who was the registrar of copyright at the time in 19, you know, a couple of years before 1998 when this law was passed, she says, you know, clearly there's legitimate reasons why one would want to remove metadata. And by the way, all the cases confirm that. The Stevens versus CoreLogic case talks about the need to only copy the image and not copy and then process all that other metadata. Remember, and this is also in their brief, that, and it's also in the CoreLogic case, that metadata includes things like the shutter speed, the f-stop, the brand of the camera. So there is all kinds of flotsam and jetsam out there in this metadata and very good reasons, as articulated in the Leonardo arbitration, as articulated in the Philpot, P-H-I-L-P-O-T case that's cited in our brief, and as articulated in the CoreLogic case, there are good reasons to only downsize the actual image and to leave all that other stuff out there. So merely knowing that their CMI, which, by the way, we don't concede and they didn't know, but in any event, district court threw out the case only on prong two. But in any event, let's just assume that we did know about the CMI. That does not provide any evidence, not a scintilla, as to the second scintra prong. So what about – I mean, is it an unreasonable inference that would-be infringers might be impeded by the existence of CMI? They might think like, I don't know, maybe we don't want to copy this one if it's like actually attributable to somebody, whereas if this thing is just like floating around out there in the ether, it sort of seems like it's public domain and we can just use it as we see fit. So I mean I guess I'm asking – I think at some level his argument is isn't it reasonable to assume that stripping out the CMI will facilitate copyright infringement? So of course, that's a great question, and that is the question, right? So is it reasonable to assume that based on no evidence? No, I would say that's not reasonable. Could there have been evidence? Theoretically, the plaintiff could have come forward with evidence that that might be the case. I guess I thought maybe – and you can correct me, and we can talk about this in rebuttal as well. But I thought there was evidence in any event that his own – Elias's own search of the internet, when he found infringing material, it happened not to have any CMI attached to it. And like the – and Shigi's stuff didn't have CMI. The hotel stuff did have CMI. And so I mean I guess I agree it's not like – it doesn't sort of hit you in the face like a ton of bricks. But it seems like there is some evidence to suggest that the less CMI, the more infringement. Absolutely. I respectfully disagree. Not a jot or scintilla in the record that that's the case. The plaintiff failed to prove – let's put aside my client's state of mind. Remember, it is reasonable grounds to know. So it's what information did Shigi have that would have led a reasonable person to believe that what they're doing is facilitating infringement or hiding it, right? But there is nothing in the record that showed that CMI matters at all. And in fact, if Your Honor reviews the interrogatory answers and their responses to our statements of disputed and non-disputed facts, they didn't find what they called infringements by looking for CMI, one thing. And the killer is undisputed that every online travel agency puts up photos without any metadata in them. Now why do they do that? And he knew that. But why do they do that? They do that because these are – Your Honor has probably gone to Expedia and looked for the family vacation. They're low-quality photos. They're thumbnails. This is not Ansel Adams or somebody, right? This is – they take out the – they don't actually take out the metadata. They just copy the part of the photo. They downsize it, lower number of pixels so that it can be made available to these online travel agencies, literally millions of photos because one hotel will have 100 photos, like all the different kind of rooms and pools and everything. So there is – there's just nothing in the record that suggests that anybody looks at CMI and says, OK, I won't infringe. If that were the case, why is it that none of his photos, not just the ones processed by my client, on the online travel agencies ever have the CMI there? And by the way, he doesn't care. He never issued a takedown notice to any of the online travel agencies. He said, hey, I need my CMI out there. So there is – as a practical reality in this business, there was no evidence in the record that anybody pays attention to the CMI. And think about it. If you're an infringer and you're out to violate the law, are you going to right-click on the photo, see the metadata, see that it says Elias, and go, OK, I'm not going to copy? I mean, that doesn't make sense. And Mr. Elias, in terms of the concealing element, he couldn't even say in his affidavit, you know what, at the relevant time period, which for my client, again, reasonable grounds to know, the relevant time period being 2014 to 2017, Mr. Elias couldn't even bring himself to state in his affidavit that without the CMI, it would conceal the infringement. No. The way he finds what he considers to be infringements is he looks up the hotel where he knows he's done photos, and then he looks and sees, OK, have I licensed these folks or not? So, again, no evidence in the record, Your Honors. Thank you very much. And with all due respect, I request that this court affirm the district court's grant of summary judgment. Very well. Thank you. Mr. Rothman, you've got five minutes remaining. Mr. Rothman, I have just one preliminary question for you. Certainly, Your Honor. With respect to SIENTA 2. Yes. The second prong. Was there any evidence in the record before the trial court when it ruled on summary judgment to establish the SIENTA requirement other than what appeared in that earlier arbitration record? Yes, Your Honor. There was Mr. Elias' testimony that he used CMI in Google searches, that he would search for his own name, and because the CMI is visible, if you type in Victor Elias, the CMI is visible to a search. It's not flotsam and jetsam. It could include information like a serial number for a camera, which is unique to a given camera. It identifies who took the picture. So, yes, there was also evidence that I support it. Deposition. I take it his testimony is in a deposition. His testimony is in a deposition. It was in a declaration that he submitted. Is there anything other than the Elias testimony as a deponent and as an affiant in the declaration that bore upon and established the SIENTA 2, enough to make it a triable issue, other than the AAA issue? Okay. At tab 50-25, there's a discussion of Radisson. Radisson is a client of ICE Portals. Radisson wanted information retained in CMI. Radisson had ICE Portal create a new program to retain that information. It was important to Radisson that it be retained. And let me make a quick point, because my friend, Mr. Woodson, is right about the AAA being relevant to both SIENTAs. It wasn't just the decision of the AAA. At 50-23, there's testimony in this case about what was alleged in the AAA. At tab 50-25, Mr. McMahon testifies in the first arbitration that they know that their system removes the metadata. And they had been accused of 1202 in both arbitrations. So, exactly the same allegations we hear on today were ones that Leonardo had accused ICE Portal of committing. First arbitration demand sets out those allegations at tab 40-53. Mr. Woodman testifies in the second arbitration at tab 50-26, acknowledging that their system removes metadata. Mr. McMahon testifies in the second arbitration at tab 50-27, acknowledging that their system removes metadata. They understand what their system does. And they also understand from all of this evidence and from their dealing with photographers that it's going to need to be an issue of fact. Whether they have constructive knowledge that their removal will conceal, facilitate infringement. And in fact, it does. The Mango case indicated that in the facts, that it does. What never came out in the CoreLogic case was that CoreLogic built an entire database with the photos that it processed through its system. And none of those photos had any metadata to identify who the photographer was. So, it was practically impossible to prove infringement of those photos in that new database that they built. And the stripping of the metadata was the facilitation for that massive infringement. But we never got that far in CoreLogic. Here, Mr. Elias testifies quite clearly that he polices his infringements. He uses reverse image search technology like ImageRights and TinEye. He searches Google for his own name. He finds infringements. He doesn't just find infringements. He finds false CMI. And why? Mr. Woodson says, you look at all these images on online travel agency websites. You won't find any metadata. Why? Because IcePortal processes almost all of them. And their system strips out the metadata from all of them. The size of the metadata. We're talking about a few bytes to reference a name of a photographer. Which is minuscule compared to the size of the photos. From a policy standpoint, Mr. Woodson would wish that this statute didn't exist. But Congress and the world that cares about IP required that we enact it. And Congress did. Thank you, your honors. I don't think that this case is nearly as confusing as the CompuLife case. Though it is confusing, I admit. But we ask you to reverse so we have an opportunity to present the facts as they are to the jury so it can make a determination. Very well. Thank you. Thank you both. All right. That case is submitted and we'll move to the fifth and final.